IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DARIN DUBROCK LURRY, JR.,**

      **Plaintiff,**

v.                                **Civil Action 2:21-cv-09**
                                     **Judge Edmund A. Sargus, Jr.**
                                     **Magistrate Judge Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

### REPORT AND RECOMMENDATION

Plaintiff, Darin Dubrock Lurry, Jr., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**I.**     **BACKGROUND**

Plaintiff's legal guardian filed an application for SSI on Darin's behalf on September 8, 2017, alleging disability beginning on September 1, 2016. (Doc. 10, Tr. 188–93). Plaintiff attained age 18 in January 2018. (Tr. 17). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held the hearing on February 6, 2020. (Tr. 42–79). On March 20, 2020, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 9–41). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on January 4, 2021 (Doc. 1), and the Commissioner filed the administrative record on June 14, 2021 (Doc. 10). Plaintiff filed his Statement of Errors, (Doc. 11), on July 28, 2021, Defendant filed an Opposition, (Doc. 12), on September 1, 2021, and Plaintiff filed a reply (Doc. 13), on September 16, 2021.  This matter is now ripe for consideration.

### A. Relevant Statement to the Agency and Hearing Testimony

Because Plaintiff's Statement of Errors pertains only to his epilepsy, the Undersigned limits her discussion to the same.  The ALJ summarized Plaintiff's relevant hearing testimony:

> The [Plaintiff] and his father alleged limiting effects due to symptoms of his physical and mental impairments. They testified to the following at the hearing, unless otherwise specified. He has problems with seizures. He takes medication for his seizure condition, and since switching to ONFI, he will have seizures about once a month. His father estimates he has a seizure about every month to month and a half. He, too, reports the seizures have slowed somewhat with ONFI medication treatment. As of the date of the hearing, the [Plaintiff]'s most recent seizure was in October 2019. A typical seizure is a "full body shake" grand mal seizure, and they typically occur in clusters of 3-11 episodes. The [Plaintiff] has a nostril spray medication to treat the seizures when they occur, as needed. After a seizure, the [Plaintiff] will be "out of it" and drowsy, and he will sleep from four to six hours. He has had a dislocated shoulder from a seizure in the past. After a typical seizure, he will not know where he is, he will have poor memory, and he will feel very tired for about a day. Sickness and poor sleep will often trigger seizures. He does not always go to the hospital after having a seizure and will sometimes lie in bed at home instead.

(Tr. 19).

### B. Relevant Medical Evidence

The ALJ summarized the relevant medical records concerning Plaintiff's physical symptoms prior to attaining age 18:

> With respect to the alleged seizure symptoms, from the filing date in September 2017 through the [Plaintiff]'s 18th birthday in January 2018, the record clearly supports some ongoing seizure episodes, and EEG testing at this time also supported an underlying seizure condition. However, there is clear concern for medication non-compliance at this time. Indeed, a neurologist noted that the breakthrough seizure clusters occurred either in the setting of illness or

noncompliance. Moreover, neurological examinations throughout this period were almost entirely normal.

As a matter of history, the [Plaintiff] was seen in the neurology clinic in March 2016 and again in January 2017 (Ex. 1F/4). He reported having a recurrence of seizures twice in December 2016, when he had two in 24 hours. He reported taking his medication, but admitted that he did not always take it on his regular schedule. He noted that his seizures generally involved twitching, jerking, and slobbering, with a fall to the ground. He was generally fatigued after a seizure. He presented to the emergency department in June 2017 with increased seizure activity (Ex. 1F/16). He had a series of about 10-15 seizures over the course of three days, each of the "grand mal" variety, clustered in groups of 2-3, lasting approximately one minute each. This was noted to have occurred during a period of medication noncompliance and poor sleep (Ex. 1F/18).

Then, as the filing date approached, he reported in August 2017 that he had had three recurrences of seizures, usually in clusters (Ex. 1F/36). He reported that these occurred in April 2017, June 2017, and August 2017. There was some concern about medication compliance at this time, as these seizures generally occurred when the [Plaintiff]'s scheduled was altered when he was at his aunt's house and not with his father. He went to the emergency department due to the August 2017 seizures, and had no further seizures while he was in the hospital (Ex. 1F/37). It was established that his medication compliance had not been great, and he possibly had been missing doses at that time. He was instructed to use a pill box and alarms to help stay compliant. He again presented to the emergency department with a cluster of six seizures in October 2017 (Ex. 1F/48 and 2F/4). He had was postictal and had some headaches post seizure, but was noted to come around "pretty quickly" afterward. He indicated that he gets the seizures every 4-6 months. He went to the emergency department approximately one week later after experiencing a 6-8[-]minute grand mal seizures which were treated with a dose of Versed (Ex. 2F/9). The [Plaintiff]'s father noted that he had accidentally been taking an inappropriate dose of Topamax at this time (Ex. 2F/10). His breakthrough seizure clusters were noted by a neurologist to occur either in the setting of illness or noncompliance (Ex. 2F/32). He was noted to be very sensitive to late or missed doses of his medication (Ex. 2F/39). His medications were changed, and midazolam was prescribed for seizures lasting more than five minutes.

Diagnostic imaging and testing was also supportive of an underlying seizure condition. He has a history of an abnormal EEG that was potentially epileptogenic (Ex. 1F/6). An EEG in October 2017 was abnormal for the presence of intermittent generalized spike wave bursts suggesting an underlying predisposition for generalized seizures (Ex. 1F/69). A brain MRI in October 2017 was normal (Ex. 1F/48). EEG testing in November 2017 was abnormal and indicative of focal seizures with rapid secondary generalization (Ex. 2F/79).

> As noted above, neurological examinations throughout this period were almost entirely unremarkable. For example, a neurological examination in January 2017 was entirely unremarkable (Ex. 1F/10). A neurological examination in June 2017 showed some decreased strength in the right upper extremity, but was otherwise normal (Ex. 1F/18). An August 2017 neurological examination was unremarkable, with the [Plaintiff] noted to be alert and interactive, with cranial nerves intact, muscle strength and tone normal, and normal sensation, reflexes, coordination, and gait (Ex. 1F/39). A neurological examination in October 2017 was again normal (Ex. 1F/50). The [Plaintiff] was alert and oriented, with normal reflexes and normal cranial nerves, normal muscle tone, and normal coordination (Ex. 1F/50). Neurological and physical examinations in November 2017 were also normal (Ex. 2F/12, 38, and 89).

(Tr. 20–21).

The ALJ then considered Plaintiff's medical records concerning Plaintiff's physical symptoms after he turned 18 years of age:

> He went to the emergency department for seizures in February 2018 (Ex. 4F/15). He was been doing well for approximately three months, until he was incarcerated for bringing a weapon to school and his medication timing was altered (Ex. 4F/18-19). His increased seizure frequency was noted to be likely due to missed doses and altered medication timing. He also reported to the emergency department in March 2018, on the day he started a new job at McDonalds (Ex. 4F/40). He had a cluster of seizures the following day as well (Ex. 4F/68). He noted that he had taken his medication, but had not eaten anything all day and been awake late the night before. His ONFI dose was increased at this time (Ex. 4F/69). His seizure control had been "much better," in early 2018, with two episodes of poor compliance noted as likely triggering seizures (Ex. 4F/146). Later in March 2018, the [Plaintiff] again had a seizure, though his father felt he may have once again missed a medication dose, as he was staying with his aunt (Ex. 4F/152).

> He had another breakthrough seizure in April 2018 (Ex. 4F/185-195). He indicated he had been compliant with his medication at this time, though had a recently had a medication change and he had more seizures after taking a Klonopin bridge. He had another seizure in the emergency department and took Ativan and fosphenytoin at that time to get them controlled. He reported he was doing better and not having seizures in June 2018 after being started on ONFI (Ex. 5F/17). He noted that he had not had a seizure in a long time in July 2018 (Ex. 5F/49). He indicated he had no seizures to report through September 2018 (Ex. 5F/55). In November 2018, he was doing well with his seizures since his medication change (Ex. 5F/91). In December 2018, he indicated that his last seizures were eight months earlier, in April 2018 (Ex. 5F/103). He noted in January 2019 that he was not having seizures and he was doing well overall (Ex. 5F/127).

In March 2019, the social worker reported that a medical provider would not sign a form stating that the [Plaintiff] could not work, as "outside of working with heavy machinery, the [Plaintiff] could seek employment" as per the last office visit, because his seizures were controlled (Ex. 5F/139). The [Plaintiff]'s father indicated that his lawyer encouraged the [Plaintiff] not to work until a disability hearing date was set. The [Plaintiff]'s father indicated that while the ONFI medication had been effective for the seizures, he was experiencing significant side effects of the medication including mood swings and aggression. He presented to the emergency department in May 2019 with seizures and the [Plaintiff] was not certain whether he had taken his medication (Ex. 5F/168). His father thought he may not have taken his medication (Ex. 5F/184). An LT/Spect scan test was recommended in July 2019 (Ex. 6F/46). He indicated that he had a seizure sometime in late August 2019 and that his typical seizure frequency was about once every 3-6 months (Ex. 6F/75). In October 2019, he reported some focal seizures with twitching that most recently happened about a month ago but typically occur many months to years apart (Ex. 6F/142). He also reported generalized tonic clonic seizures which decreased to approximately one per month after a change of medication in May 2019 (Ex. 6F/142). His most recent generalized tonic clonic seizure was reportedly also about a month earlier. His longest stretch without a seizure was about seven months. Given his complaints of poor control with reported compliance, his doctor sent him back to the EMU where they were unable to elicit any seizures despite provocation and no medication (Ex. 5F/203). In July 2019 he denied any seizure since being seen in May 2019 (Ex. 5F/36). Then, in October 2019 he reported a "partial seizure" a month earlier (Ex. 5F/108).

Physical and neurological examinations after the [Plaintiff]'s 18th birthday were again almost entirely normal, aside from an examination in the hospital directly after a seizure episode, with subsequent examinations unremarkable. For example, in February 2018, he was neurologically intact and ambulating without difficulty (Ex. 4F/18). A neurological examination in March 2018 was unremarkable (Ex. 4F/40). Then, another examination the following day after another seizure cluster, revealed that the [Plaintiff] neglected his left side with neurologic testing (Ex. 4F/74). He had some abnormal heel to shin cerebellar function, abnormal gait, and truncal instability. He was generally off balance. He has some slow and sometimes halting speech in July 2018 during a phone call in July 2018, that he related to medication side effects (Ex. 5F/49). The neurological examination in December 2018 was normal and he had a normal gait (Ex. 5F/107). A neurological examination in May 2019 was unremarkable (Ex. 5F/168). A neurological examination in October 2019 was unremarkable with normal gait (Ex. 6F/145).

As for the diagnostic imaging results after the [Plaintiff]'s 18th birthday, an EEG in July 2018 revealed a single, irregular, bilateral diffuse polyspike and wave complex representing increased risk of seizure (Ex. 5F/35). An MEG in November 2018 was abnormal and revealed interictal dipoles with left frontotemporal operculum, with left hemisphere language dominant (Ex. 5F/285). During spect CT testing, the [Plaintiff] did not have seizure activity and a proper scan could not be

5

performed (Ex. 6F/123). The five[-]day EEG in November 2019 was normal (Ex. 6F/125).

(Tr. 31–33).

### C. The ALJ's Decision

The ALJ first found that Plaintiff was an adolescent on September 8, 2017, the application date, but attained age 18 in January 2018. (Tr. 17). The ALJ found that Plaintiff has not engaged in substantial gainful activity since September 8, 2017, the application date. (*Id.*). The ALJ determined that prior to attaining age 18, Plaintiff had the following severe impairments: epilepsy; ADHD; and a neurocognitive disorder. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment prior to Plaintiff attaining age 18. (*Id.*). The ALJ also determined that prior to attaining age 18, Plaintiff did not have an impairment or combination of impairments that functionally equaled the severity of the listings. (Tr. 18).

In the six domains of functioning that are pertinent to a child's benefits application, Plaintiff was found to have less than marked limitation in: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself. (Tr. 22–27). Plaintiff was found to have marked limitation in health physical well-being. (Tr. 27). Because a finding of one "extreme" limitation or two "marked" limitations is needed in order to support an award of benefits, the ALJ denied Plaintiff's claim prior to attaining age 18. (*Id.*).

The ALJ determined that because Plaintiff did not have an impairment or combination of impairments that met, medically equaled any listing or functionally equaled the listings, Plaintiff was not disabled prior to attaining age 18. (Tr. 28). The ALJ then determined that since attaining age 18, Plaintiff has not developed any new severe impairments. (*Id.*). The ALJ found that since

attaining age 18, Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*) In assessing the severity of Plaintiff's mental impairment utilizing the "paragraph B" criteria of the mental listings, the ALJ found that Plaintiff has moderate limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in the ability to concentrate, persist, or maintain pace; and moderate limitations in the ability to adapt or manage oneself. (Tr. 29–30).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> After careful consideration of the entire record, [the ALJ] find[s] that, since attaining age 18, the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; never work around hazards such as unprotected heights or work in proximity to exposed moving mechanical parts; never engage in occupational driving; and never operate heavy machinery. Mentally, he can do simple, routine, repetitive, short-cycle tasks at an average pace without strict time or production demands; interact constantly with others on matters limited to the straightforward exchange of information without negotiation, persuasion, or conflict resolution; and can adapt to rare changes in duties consistent with simple tasks that are explained or demonstrated, but he may require one to two reminders when learning a new task.

(Tr. 30).

As for the relevant opinion evidence, the ALJ found,

> As for the opinion evidence, the reviewing physician opinions with the State Agency Division of Disability Determinations (DDD) are persuasive overall (Ex. 1A and 3A). The state agency physical consultants at both the initial and reconsideration levels opined that the [Plaintiff] had no exertional limitations with postural and environmental limitations. These opinions are supported by the bulk of the objective medical evidence in the record in which the [Plaintiff] has epilepsy as supported by diagnostic imaging and intermittent seizures. Moreover, state agency medical consultants are highly qualified physicians who are experts in the evaluation of the medical issues in disability claims under the Act. In this instance, their opinions are well-supported by the medical evidence of record, and I have adopted some limitations on heights and hazards. However, I have added an exertional limitation to the light level, given the safety concerns with lifting and carrying heavier weights as well as his noted fatigue at times.

The state agency psychological consultant at the initial and reconsideration level opined that the [Plaintiff] can do work with one or two steps; can do work with low production demands/work quotas; no social limitations; and no articulated adaptation limitations. These opinions are generally supported by the bulk of the objective medical evidence in the record, which shows some mental symptoms upon examination, along with a history of complaints of mood issues, a "spacy" sensation, and irritability. I find the state agency mental opinions persuasive in limiting him to unskilled work, with pace/production limits. This is also consistent with the WAIS-IV full scale IQ score of 71 from testing in May 2018 (Ex. 4F/230). However, I find him further limited in social interaction and adaptation, for the reasons described in Finding 5 above. The neuropsychological examination noted some difficulty learning new tasks, and so the degree of adaptation should be limited. The [Plaintiff]'s father also testified to, and reported, some mood swings and irritability which is not typically observed but given the consistency of the complaints is considered, as well as some difficulty tolerating frustration, which also warrant limits on adaptation as well as social interaction. Specifically, the undersigned limited the type of social interaction the [Plaintiff] could perform, but not the amount, as he is typically pleasant and cooperative. However, given his deficits in tolerating frustration and stressors, the undersigned included the kinds of social interactions more likely to promote conflict or frustration. I did not limit him to any specific number of task steps. I find this is not a useful way to describe complexity, as nearly any task can be divided into additional steps. Moreover, I find the record supports the ability to perform unskilled work, given his daily activities (including video games, which are complex) and intelligence testing.

The neuropsychological evaluation of psychologist Ari Rabkin, Ph.D., is not persuasive (Ex. 5F/206-212). The neuropsychological evaluation in May 2018 revealed evidence of executive dysfunction, cognitive slowing, and bilateral fine motor deficits. He struggled with more complex tasks that required planning ahead and higher order reasoning. While I agree that the [Plaintiff] has some psychological deficits, the record as a whole does not support that they are more than moderate, and they have been accommodated by reducing complexity (to simple tasks, though he has average cognition), pace, social interaction and adaptation in the RFC above. I also note[] that the purpose of this evaluator's opinions was to identify the interventions that would benefit the [Plaintiff]. Under the Act, we are tasked with identifying the most he could do in a working environment, not the ideal environment. For example, high school level academic work is quite challenging and certainly more demanding that a typical unskilled occupation. Therefore, while I accept that the [Plaintiff] would benefit from the interventions proposed, they are not medically necessary to allow him to perform the range of unskilled work adopted here. Moreover, as noted, he was never identified as learning disabled in school and he was not placed on an IEP. Dr. Anderson estimated he had average intelligence based on his performance during the consultative examination. Also, the neuropsychologist saw him only on two occasions, for testing and then to discuss the results, and both were done before his

>   seizures were well controlled on his current medications. I have limited complexity to simple tasks, which, by definition, require only a brief demonstration or up to a month to fully learn, and do not find a basis to adopt Dr. Rabkin's proposed accommodations. Lastly, I note that the neuropsychologist believed that some mood or anxiety problems could be a factor in the [Plaintiff]'s performance, but the [Plaintiff] has never followed up with mental health treatment or further evaluation.
>
>   The opinion of psychological consultative examiner, Eric Anderson, Ph.D., is not persuasive overall (Ex. 3F). Dr. Anderson opined that the [Plaintiff] was able to remember and carry out instructions—both one to two step instructions and more complex instructions; sustain attention, concentration, and persistence, and to persist in work-related activity; maintain effective social interactions on a consistent and independent basis with supervisors, coworkers, and the public; and he has the ability to deal with the normal pressures in a competitive work setting. This opinion was made after a thorough evaluation of the [Plaintiff] and it is somewhat consistent with the broader record insofar as it finds no more than moderate limitation in any of the four areas of mental functioning. However, overall, Dr. Anderson appears to overestimate the [Plaintiff]'s abilities, as he appears to articulate no specific functional limitations, which would support finding no severe mental health limits at all. Dr. Anderson was not given an opportunity to review the collateral record including the earlier neuropsychological evaluation. While the [Plaintiff] performed well on the date of this exam, the record as a whole appears to support some limits, which I have set out above.

(Tr. 34–35).

Plaintiff has no past relevant work. (Tr. 36). Relying on the vocational expert's testimony, the ALJ concluded that since attaining age 18, Plaintiff could perform jobs that exist in significant numbers in the national economy, such as a garment sorter, packager, and cleaner. (Tr. 36–37). She therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, since September 8, 2017, the date the application was filed . . . ." (Tr. 37).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such

9

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

### III.  DISCUSSION

Plaintiff raises a narrow assignment of error: that the ALJ's finding at step five was not supported by substantial evidence because she relied on self-contradictory testimony from the vocational expert ("VE"). (Doc. 11 at 7–13).

At step five of an ALJ's sequential analysis, the ALJ determines whether the claimant, based on the claimant's residual functional capacity and vocational factors (such as age, education, and work experience), can "make an adjustment to other work." 20 C.F.R. § 404.1520(g)(1). Although the claimant "bears the burden of proof during the first four steps, . . . the burden then shifts to the Commissioner at step five." *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 469 (6th Cir. 2017) (quotation marks and citations omitted omitted). To satisfy that burden, "the Commissioner must identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Id*. (quotation marks and citation omitted omitted). In doing so, the ALJ may "take administrative notice of reliable job information available from various governmental and other publications." 20 C.F.R. § 404.1566(d). The Dictionary of Occupational Titles ("DOT") "is one such publication upon which an ALJ may rely." *Springer v. Comm'r of Soc. Sec.*, 451 F. Supp. 3d 744, 765 (E.D. Mich. 2020) (citation omitted). "The ALJ may also seek

the views of [a VE], who may present evidence that includes information from outside the DOT, including other reliable publications, information obtained directly from employers, or from a VE's . . . experience in job placement or career counseling." *Id*. (quotation marks and citations omitted).

Where an ALJ relies solely on a VE's hearing testimony, as the ALJ did in this case, (*see* Tr. 37), the Court must decide whether substantial evidence supports the ALJ's decision to do so. *See Springer*, 451 F. Supp. 3d at 765 (citation omitted) (noting that, whether the ALJ's decision to rely on the VE's testimony is supported by substantial evidence is decided on a case-by-case basis considering, as a whole, the VE's testimony and the administrative record).  At base, the Court must be able to engage in a "meaningful review" of the ALJ's decision.  *Moyers v. Colvin*, No. 3:13-0959, 2015 WL 1013992, at *21 (M.D. Tenn. Mar. 9, 2015*), report and recommendation adopted*, No. 3:13-cv-0959, 2015 WL 1467178 (M.D. Tenn. Mar. 30, 2015).

Relevant here, "substantial evidence does not support an ALJ's decision to deny disability benefits where the VE's testimony was unclear." *Zerby v. Comm'r of Soc. Sec. Admin.*, No. 1:13cv1405, 2014 WL 3956778, at *6 (N.D. Ohio Aug. 13, 2014) (citations omitted); *see also Springer*, F. Supp. 3d at 767 ("Without such a bridge or other explanation by the ALJ concerning why she found the VE's experience-based opinion concerning the number of jobs to be reliable, this Court cannot meaningfully review the ALJ's finding of reliability."); *Moyers*, 2015 WL 1013992, at *21 (remanding where the VE's testimony was "unacceptably vague" prohibiting "meaningful review of the Commissioner's decision").  That is what happened in this case.

The ALJ crafted an RFC which "accounted for the claimant's epilepsy by limiting him to light work (due to the risk of harm if he seized carrying something heavier, and his noted fatigue at times, which could be a medication side effect) . . . ." (Tr. 33).  In other words, Plaintiff's risk of

11

seizure at work was accounted for in the RFC. When the ALJ questioned the VE at the hearing, she described a hypothetical individual,

> who could perform a range of light work as that's defined in our regulations and the DOT. This individual can frequently climb ramps and stairs, never climb ladders, ropes or scaffolds, or work around hazards such as unprotected heights, or work in proximity to exposed mechanical parts, cannot engage in occupational driving or the operation of heavy machinery. Mentally, this individual can perform simple, routine, repetitive, short-cycle tasks at an average pace without strict time or production demands. Could interact constantly with others, but on matters limited to the straightforward exchange of information without negotiation, persuasion or conflict resolution, and could adapt to rare changes in duties consistent with simple tasks that are explained and demonstrated. He may require one or two reminders when learning a new task. Can this hypothetical individual perform any work consistent with someone of the claimant's age, education and past work experience?

(Tr. 74). In response, the VE testified there were some occupations that were consistent with the hypothetical, including Garment Sorter, Packager, and Cleaner. (*Id.*). Additionally, the ALJ asked the VE some hypotheticals related to working off-task, absenteeism, and supervision. (Tr. 75).

When Plaintiff's counsel was permitted to examine the VE, he asked,

> based on your education and experience, do you have an opinion about what the tolerance is for seizure activity in the workplace by employers, particularly if an individual has grand mal or generalized clonic-type seizures that would require calling EMS for treatment? . . . [D]o you have an opinion about what tolerances are for that?

(Tr. 76). The VE replied that, "generally, with that type of seizure -- and even if there's just one, and that is a condition that's uncontrolled where that could happen at any time, that is work preclusive. It's a liability issue." (*Id.*).

Plaintiff's hypothetical was grounded in the record. Plaintiff experienced six seizures which required calling emergency medical services between February 2018 and May 2019. (Doc. 11 at 8–9 (citing Tr. 729, 755, 764, 782, 819, 865, 893, 1108)). And the VE indicated that even one such seizure would be work-preclusive, which contradicted her testimony that there were sufficient

12

occupations in the national economy for Plaintiff. But the ALJ did not meaningful resolve this discrepancy. Rather, she "accept[ed] the vocational expert's analysis, as it is not contradicted and her sources of data are considered reliable . . . ." (Tr. 36). Based solely on the VE's testimony, the ALJ concluded that a finding on non-disability was appropriate because there were sufficient occupations which Plaintiff could perform (Tr. 37).

Perhaps the ALJ did not find Plaintiff's hypothetical for the VE entirely on-point for the case at hand. Notably, the VE remarked that her opinion was relevant to "a condition that's uncontrolled . . . ." (Tr. 76). And there appeared to be skepticism in the ALJ's opinion regarding the extent to which Plaintiff's condition was capable of being controlled and was being properly managed. For instance, the ALJ concluded that adjustments to Plaintiff's medication shortly after his eighteenth birthday "appear[ed] to have largely controlled his seizures." (Tr. 31). She also remarked that "[h]is increased seizure frequency was noted to be likely due to missed doses and altered medication timing." (*Id.*). She cited instances in which Plaintiff, or his father, reported to medical professionals that they were unsure if Plaintiff had taken his medication prior to experiencing a seizure. (Tr. 31–32 (citing Tr. 851, 1126)). And she noted an instance in which a social worker reported that a medical provider would not sign a form stating that Plaintiff could not work, under the belief that Plaintiff's seizures were controlled. (Tr. 32 (citing Tr. 1081)).

Still, Plaintiff's "longest stretch without a seizure was about seven months." (*Id.*). In May and September of 2019, the year preceding the hearing, Plaintiff reported experiencing seizures. (*Id.* (citing Tr. 1306, 1378)). Plaintiff also identified numerous instances in the medical records in which his seizures are described as "intractable" (Doc. 11 at 9 (citing Tr. 532, 949, 1045, 1131, 1268, 1412)), "drug resistant" (*Id.* (citing Tr. 845, 1049, 1135, 1450)), and "medically refractory" (*Id.* at 9–10 (citing Tr. 1302, 1307), all of which suggest that the condition was not controlled.

13

Further, the ALJ explicitly accounted for the risk of seizure at the workplace in her RFC determination, suggesting she was not entirely convinced that the seizures were controlled. (Tr. 33).

This conflicting evidence does not establish with certainty that Plaintiff's seizures were controlled, and so it remains unclear why the ALJ disregarded the VE's testimony that an uncontrolled seizure condition would be work-preclusive. The ALJ did not acknowledge that the VE's testimony was self-contradictory and relied on it to make the determination that Plaintiff could perform any of the three occupations described. (Tr. 36–37). In sum, the VE's testimony was unclear as to whether Plaintiff could perform the relevant occupations, but the ALJ did not explain how she resolved the conflicts in the testimony. Because "substantial evidence does not support an ALJ's decision to deny disability benefits where the VE's testimony was unclear[,]" the Undersigned finds that substantial evidence does not support the ALJ's finding at step five. *Zerby*, 2014 WL 3956778, at *6.

Thus, a limited remand is necessary for the narrow purpose of conducting another step-five analysis to assess which, if any, of the three occupations can be performed under the epilepsy restrictions set forth in the ALJ's RFC. *See, e.g.*, *Springer*, 451 F. Supp. 3d at 768 (ordering remand for the limited purpose of conducting another step-five analysis); *Woodruff v. Astrue*, No. 1:12-cv-1752, 2013 WL 821336, at *7 (N.D. Ohio Mar. 5, 2013) (same).

### IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability finding and **REMAND** this case to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g).

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date: October 13, 2021                     /s/ Kimberly A. Jolson
                                           KIMBERLY A. JOLSON
                                           UNITED STATES MAGISTRATE JUDGE